Minute Order Form (06/97)

# United States District Court, Northern District of Illinois



| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 2402 | **DATE** | 10/5/2000 |
| **CASE TITLE** | PTS Labs LLC vs. Abbott Laboratories etc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion to vacate judgment and reconsider the March 15 and April 25, 2000 Memoranda and Orders and defendant's motion for alternate relief and sanctions. We deny both motions.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | OCT 06 2000 | |
| ✓ | Docketing to mail notices. | | date docketed | 110 |
| | Mail AO 450 form. | ED-7 FILED FOR DOCKETING | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 00 OCT -5 PM 3: 46 | | |
| WAH | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PTS LABS LLC, an Illinois limited liability )
company, )
 )
Plaintiff-Counterdefendant )
 )
vs. ) No. 99 C 2402
 )
ABBOTT LABORATORIES, an Illinois )
corporation, )
 )
Defendant-Counterplaintiff. )

## MEMORANDUM AND ORDER

This case has had a brief but somewhat colorful past. Plaintiff's efforts to obtain patent protection have been far more extended than is usually the case, and now we face an evident inconsistency between what has happened in the lawsuit and what has happened in the Patent and Trademark Office (PTO). That has led to plaintiff's Motion to Vacate Judgment and Reconsider the March 15 and April 25, 2000 Memoranda and Orders and defendant's Motion for Alternate Relief and Sanctions. We deny both motions.

As described in our Memorandum and Order of March 15, 2000, the first patent application was filed in 1994 and was thrice rejected as obvious. Two claims were finally allowed, based on what can be characterized as Santucci 1. A new application was filed on December 17, 1996, and the first application was thereafter abandoned. Earlier in 1996 plaintiff began marketing freezer pops based on the claimed invention. That led to a lawsuit initiated by the defendant, alleging false advertising. Judge Castillo agreed and explained why, emphasizing that he believed that Santucci 1 compared "apples and oranges." That, in turn, led to the execution of a settlement agreement, release of claims and the entry of a final



judgment and order. At about the same time the claims in the new application were rejected as obvious, the only difference between the claimed composition and the prior art being that the claimed composition could be frozen.

About three weeks after the false advertising litigation concluded, the applicant filed new claims relying heavily upon Santucci 1. Reference was made to the prior lawsuit and the briefs of the parties were furnished to the examiner, but not the text of Judge Castillo's criticism of Santucci 1 or the final judgment. The claims were allowed on February 2, 1998, and the '458 and '459 patents issued.

On June 19, 1998, a continuation application was filed ('985 application). The claims were rejected as obvious on December 7, 1998. Thereafter, in February 1999, plaintiff sued defendant in Utah for infringement of the '458 and '459 patents and sought a preliminary injunction. The case was transferred here on April 13, 1999. In the PTO proceeding plaintiff submitted new claims on the continuation application on June 3, 1999, including a "suspending agent," which, it was claimed, softened the frozen solution. The applicant relied upon Santucci 1 and also furnished the pleadings, briefs and exhibits from the preliminary injunction motion, which included Judge Castillo's remarks, the settlement agreement and the final judgment order. It also included the Hayes and Sears prior art. The claims were rejected on August 9, 1999, as obvious. The patent examiner concluded that freezing a well-know liquid formulation would have been obvious to one skilled in the art, that Santucci 1 compared an unflavored liquid to a flavored frozen composition, and that frozen rehydrating solutions were in the prior art.

That prompted a response by plaintiff on September 8, 1999. The response focused

on delivery in a sealed freezable packaging material and use of a suspension agent so as to soften the consistency of the freezer pop. Included with the response was a second Santucci report dated September 3, 1999, which contended that sealed containers, for oral rehydration, were not in the prior art and were important to avoid contamination and provide uniform doses and that a soft product, as distinguished from ice cubes, also fulfilled a long-standing need. The report included a copy of the 1998 article by Santucci and others. Another exhibit was a John Patience declaration, in which he claimed commercial success. Finally, deposition extracts of Marie Hayes and D. Jacques indicated that Hayes had advocated freezing in popsicles only, that delivery by freezer pops had not occurred to her, that the freezer pop product was a great idea, that Jacques thought the packaging was unique, and that the consistency made it a different product. A supplementary response on October 21, 1999, conceded that use of a suspending agent to make soft ice was well known in the art. The claims were rejected on November 1, 1999, the third rejection.

Yet another response was filed on February 4, 2000. There the emphasis was on a telemarketing survey of 501 pediatricians, nurse practitioners and pediatric nurses, in which 61% responded that in their practice flavored electrolyte freezer pops were better tolerated than flavored electrolyte liquids. A large majority also answered "yes" to a question asking if the interviewee regarded the introduction of freezer pops as a significant advancement in the treatment of dehydration. Santucci weighed in with another declaration, saying the survey was highly relevant in establishing that flavored electrolyte freezer pops have unexpected and advantageous tolerance properties. That submission and a subsequent interview on February 22, 2000, finally carried the day. The claims were allowed on May 16, 2000.

In the meantime, this court, after denying plaintiff's motion for a preliminary injunction on June 24, 1999, had granted summary judgment to the defendant on March 15, 2000, holding that the claimed invention was obvious as a matter of law. On April 3, 2000, plaintiff advised the court and defendant at a status hearing that a pending application, if issued, could impact the prior decision of this court. On April 18, 2000, defendant moved for entry of a final judgment pursuant to Fed.R.Civ.P. 54(b). Two days later, on April 20, 2000, plaintiff moved for reconsideration, relying heavily upon the telemarketing survey. That same day defendant orally moved for copies of the documents relating to the pending patent application. Plaintiff again represented that the pending application did relate to the issues that had been and were before the court. We ordered the production of those documents, recognizing that defendant's use of those documents in the PTO required this court's permission. We thereafter, on April 25, 2000, denied the motion for reconsideration. Before it had furnished any of the documents to defendant, plaintiff on May 2, 2000, filed PTS Labs' Agreement to Defendant's Motion for Entry of Final Judgment. On May 4, 2000, we entered final judgment and vacated, as moot, the April 20, 2000, order compelling production of the pending application documents. On May 16, 2000, plaintiff was advised by the PTO that the claims in the pending application had been allowed. These motions soon followed.

We turn first to Abbott's motion for alternate relief and sanctions. Defendant renews its contention, raised by its earlier summary judgment motion but not ruled upon, that plaintiff's infringement claims are resolved by the settlement agreement entered into by the parties to settle the litigation before Judge Castillo. It goes on to catalogue a number of instances in which it claims plaintiff failed to perform its obligations to both this court and to

the PTO. Further, the motion asks that we reconsider our prior ruling in which we did not, as an alternative ground, grant summary judgment because PTS engaged in inequitable conduct; it moves for a present finding of inequitable conduct; and it moves for sanctions. We do not now grant that motion because we adhere to our prior ruling that the patents are invalid as obvious and a decision is therefore unnecessary. Because plaintiff may well seek to appeal, we recognize that we may have to revisit the matter should there be a reversal and that our perception of the record may well be helpful to the appellate court. Accordingly, we set forth that perception.

Defendant's production request early in the lawsuit clearly covered the documents relating to the pending application; this court ordered production, which should have included those documents; and plaintiff expressly recognized its continuing obligation. Plaintiff now suggests, although it does not expressly so state, that all documents relating to the pending application then extant were in files reviewed by the defendant on April 1 and 2, 1999. Even if this were so (and it is difficult to believe that defendant would have overlooked them), that file continued to expand. The examiner rejected claims as obvious for a second time on August 9, 1999, and for a third time on November 1, 1999. The August 9, 1999, rejection came after Judge Castillo's criticisms and the final judgment in that case had been furnished to the examiner. The reasons why the examiner concluded that the claimed invention was obvious have been, for both occasions, previously described. Those rejection documents were not furnished either to defendant or the court.

In its opposition to defendant's motion for summary judgment on the ground of inequitable conduct, plaintiff on December 21, 1999, argued that Judge Castillo's criticisms

and the final judgment were not material because the examiner had been given so much other documentation from the case. But it then knew that the '458 and '459 patents had issued in the absence of that information and that the claims in the '985 application had been rejected after the examiner had been furnished that information. One can only suppose, then, that the '458 and '459 patents would not have then issued if the record before the PTO had been as complete as it later became. One can question the making of the "not material" argument without disclosure of the adverse information known only to plaintiff. And one can question whether this court's ruling would have been the same if it had been aware of that information.

The PTO was equally in the dark about what was happening in this litigation, despite the requirements of MPEP, §2001.06(c) (7th edition 2000). The examiner was not advised that the preliminary injunction had been denied and she was not furnished Abbott's motion for summary judgment and exhibits, brief in support of its motion for summary judgment, the Memorandum and Order of March 15, 2000, granting summary judgment to defendant, the denial of the motion for reconsideration, or the final judgment.

Just prior to that final judgment an issue before the court was whether or not we should enter a Rule 54(c) final judgment order. Plaintiff, on April 3, 2000, and April 20, 2000, advised the court that a pending application, if issued, could impact the prior decisions of the court. On April 20, 2000, we ordered production of the pending application documents. On May 2, 2000, when PTS agreed to the entry of a final judgment, thus mooting any further discovery, it had this to say, "Finally, the application pending before the Patent and Trademark Office is not the patent in suit. There are no patent reexamination or reissue proceedings pending that would justify any reconsideration of this Court's decision." Those statements are

technically true – the pending application was a continuation application. But the message conveyed was contrary to the representations of April 3 and April 20, 2000. They are, as well, contrary to plaintiff's contentions in its Motion to Vacate. It seeks vacation because the core issues before the PTO were the same as the issues here and the PTO granted the patent. One is left with an abiding feeling that plaintiff did not wish to disclose the nature of that application until the patent issued.

We think the reasons for that desire are self-evident. The issuance of a patent upon the '985 application would provide plaintiff with the argument it stresses now: the PTO, the presumed expert, has issued a patent with a statutory presumption of validity, and the court should defer with respect to the '458 and '459 patents, even though different patents, because the issues are the same. But if defendant was aware of the application it had options which could have been fatal to the application. It could obtain permission of the court (if it needed to do so) to furnish to the PTO the adverse rulings and the related briefs and pleadings for consideration by the examiner -- something plaintiff itself should have done. It could have argued that pursuant to In re Freeman, 30 F.3d 1459, 1465-69 (Fed.Cir. 1994), this court's summary judgment ruling was binding upon the PTO and precluded issuance of the patent (it so argues here, but the validity of the patent arising from the '985 application is not directly at issue in this litigation). It could have filed a protest in the PTO pursuant to 37 C.F.R. §1.291 prior to the allowance of claims.

But all that we leave, if necessary, to another day.

On April 25, 2000, we denied the motion for reconsideration, repeating from the earlier opinion that "the administration of rehydration compositions to small children in frozen form

was well known and commonly practiced before the claimed invention," and again concluding that "delivery by freezer pop rather than popsicle is obvious." On May 17, 2000, the claims were allowed after submission of the telemarketing survey. Why the telemarketing survey should have carried the day is difficult to understand. The patent examiner had rejected the claims when the record included prior art disclosing popsicles as an effective way to administer electrolytes to children. The survey does not suggest that freezer pops are more efficacious than popsicles. It does indicate that children react better to frozen electrolyte than to liquid – but that was the reason to administer it in popsicle form in the first place.

The ultimate question is whether it is obvious, from the use of a popsicle form, to use a freezer pop form as an alternative. Frozen treats for children customarily come in one form or the other, and both forms are readily available. We think it is clearly obvious that either form can be used to administer electrolyte to children. Indeed, plaintiff relied before the PTO on a laudatory reference in the December 1995 Contemporary Pediatrics to its product, which described the product both as "ice pops" and "Popsicles."

JAMES B. MORAN
Senior Judge, U. S. District Court

Oct. 5, 2000.